A. Jeff Ifrah, Esq.
N.J. Bar No. 050691992
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006
Tel. (202) 524-4140
Fax (202) 524-4141
jeff@ifrahlaw.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROSEMAWR MUNICIPAL PARTNERS FUND LP AND ROSEMAWR CAPITAL I LP,<br><br>       Plaintiffs,<br><br>   v.<br><br>ACR ENERGY PARTNERS, LLC, ENERGENIC-US, LLC, DCO ENERGY, LLC, MARINA ENERGY, LLC AND SOUTH JERSEY INDUSTRIES, INC.<br><br>       Defendants. | Civil Action No.<br><br><br>**COMPLAINT**<br><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs Rosemawr Municipal Partners Fund LP ("RMPF") and Rosemawr Capital I LP ("RC1" and, together with RMPF, "Rosemawr" or "Plaintiffs"), hereby submit this complaint, by and through their attorneys, against Defendants ACR Energy Partners, LLC ("ACR"), Energenic-US, LLC ("Energenic"), DCO Energy, LLC ("DCO"), Marina Energy, LLC ("Marina"), and South Jersey Industries, Inc. ("SJI") (collectively, the "Defendants").

## PARTIES

1.      Plaintiff RMPF is a limited partnership, organized under the laws of the State of Delaware, with its principal place of business located at 810 Seventh Avenue, 27th Floor, New York, New York 10019.  RMPF is a pooled investment fund.

2.      Plaintiff RC1 is a limited partnership, organized under the laws of the State of Delaware, with its principal place of business located at 810 Seventh Avenue, 27th Floor, New York, New York 10019. RC1 is a pooled investment fund.

3.      Upon information and belief, Defendant ACR is a limited liability company, organized under the laws of the State of New Jersey, with its principal place of business located at Building 500, 5429 Harding Highway, Mays Landing, New Jersey 08330. Also upon information and belief, ACR was organized as a single-purpose entity for the development, construction, ownership, and operation of a district energy system, which was built to serve the Revel Entertainment Resort, located in Atlantic City, New Jersey.

4.      Upon information and belief, Defendant Energenic is a limited liability company, organized under the laws of the state of Delaware, with its principal place of business located at Building 500, 5429 Harding Highway, Mays Landing, New Jersey 08330.

5.      Upon information and belief, Defendant DCO is a limited liability company, organized under the laws of New Jersey, with its principal place of business located at Building 500, 5429 Harding Highway, Mays Landing, New Jersey 08330. Also upon information and belief, DCO is an energy development company.

6.      Upon information and belief Defendant Marina is a limited liability company, organized under the laws of New Jersey, with its principal place of business located at 1 South Jersey Plaza, Folsom, NJ 08037.

7.     Defendant SJI is a public company, incorporated under the laws of New Jersey, with its principal place of business is located at 1 South Jersey Plaza, Folsom, NJ 08037.

8.     Upon information and belief, Energenic is the sole member of ACR.

9.     Upon information and belief, Marina and DCO are the members of Energenic.

10.    Upon information and belief, Marina is a wholly-owned subsidiary of SJI.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, 15 U.S.C. §78aa, and other applicable provisions.

12.    This Court has personal jurisdiction over the Defendants because Defendants' principal places of business are in the State of New Jersey and in this District, the fraudulent acts complained of herein have occurred in the State of New Jersey and in this District, and the injuries Defendants caused to Plaintiffs have occurred within the State of New Jersey and in this District.

13.    Venue is appropriate in the District of New Jersey under 28 U.S.C. §1391(b)(1), (b)(2), (c)(2) and (d), and 15 U.S.C. §78aa because Defendants reside in this District and the fraudulent acts complained of herein occurred in this District.

## STATEMENT OF FACTS

14.    Revel Entertainment Group, LLC ("Revel") was engaged in the development, financing, construction and operation of a hotel, casino and entertainment complex, located at Connecticut Avenue and the Boardwalk, in Atlantic City, New Jersey (the "Revel Facility").

15.    Revel and ACR entered into an Energy Sales Agreement dated February 17,

2011, as amended and restated on March 8, 2011 and April 11, 2011 (as amended, the

"ESA")[1]., whereby ACR would provide heating, cooling, electric energy and other energy

related services to the Revel Facility (the "Energy Services"). A true copy of the ESA is

annexed hereto and incorporated herein as Exhibit A.

*The ACR Bond Offering and Loan Documents*

16.     ACR desired to finance the construction and operation of its energy facilities

(the "ACR Facility") for the purpose of providing the Energy Services to the Revel Facility

through the issuance of tax-exempt and taxable bonds issued by the New Jersey Economic

Development Authority (the "Authority").

17.     On April 1, 2011, the Authority issued $118,600,000, aggregate principal

amount, Energy Facility Revenue Bonds (ACR Energy Partners, LLC Project) Series 2011. The

bond issuance consisted of $26,000,000 Series 2011A (Tax-Exempt) and $92,600,000 Series

2011B (Federally Taxable) (the "Bonds").

18.     The proceeds from the sale of the Bonds were loaned to ACR (the "Loan")

pursuant to the terms of a Loan Agreement dated April 1, 2011 (the "Loan Agreement"). A true

copy of the Loan Agreement is annexed hereto and incorporated herein as Exhibit B.

19.     The Loan was also secured by a Promissory Note ("Note") issued by ACR in

favor of the Authority. A true copy of the Note is annexed hereto and incorporated herein as

Exhibit C.

20.     To secure its obligations under the Loan Agreement and the Note, ACR

executed and delivered to the Authority a Leasehold Mortgage and Security Agreement, dated

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the referenced Agreement.

as of April 11, 2011 ("Leasehold Mortgage") granting a mortgage on and security interest in leaseholds on two parcels of real property, improvements and fixtures constituting part of the ACR Facility.  A true copy of the Leasehold Mortgage is set forth at Exhibit D.

21.     To further secure its obligations under the Loan Agreement and the Note, ACR executed and delivered to the Authority and to the Trustee an Assignment and Security Agreement ("Assignment and Security Agreement") dated as of April 11, 2011.  A true copy of the Assignment and Security Agreement is annexed hereto and incorporated herein as Exhibit E.

22.     ACR, Revel and ACR's "Collateral Agent" entered into an Intercreditor Agreement dated February 17, 2011 ("Intercreditor Agreement").  A true copy of the Intercreditor Agreement is annexed hereto and incorporated herein as Exhibit F.  Pursuant to a Counterpart, dated April 1, 2011 ("Counterpart"), the Trustee was named as ACR's Collateral Agent under Section 8.17 of the Intercreditor Agreement.  (The Counterpart is annexed as Schedule 1 to the Intercreditor Agreement).

23.     The Loan Agreement, the Note, the Leasehold Mortgage, the Assignment and Security Agreement, and the Intercreditor Agreement, together with certain other agreements and instruments, are collectively referred to herein as the "Loan Documents."

24.     Specifically, the Loan Documents provide that the proceeds of the Loan are to be used by ACR to pay for (i) a portion of the costs of the construction of the ACR Facility; (ii) capitalized interest on the Series 2011 Bonds; (iii) funding a debt service reserve fund for each series of the Bonds; and (iv) the costs of issuing the Bonds and certain other costs related to the ACR Facility.

*Ancillary Agreements executed with the Bond Offering*

25.    In connection with the issuance of the Bonds, Raymond James & Associates, Inc. acted as underwriter.

26.    The Authority also entered into a Trust Indenture dated as of April 1, 2011 ("Indenture"), wherein the Authority assigned certain of its rights under the Loan Agreement to the trustee named in the Indenture (the "Trustee") for the benefit of the holders of the Bonds (the "Bondholders"). Pursuant to the Indenture, the Trustee has full authority to exercise all rights and remedies under the Loan Documents on the behalf and for the benefit of the Bondholders. A true copy of the Indenture is annexed hereto and incorporated herein as Exhibit G.

27.    Likewise, as security for the payment of the Bonds, the Loan Agreement also assigned certain of the Authority's rights under the Loan Agreement and the Note to the Trustee. (Exhibit B, Loan Agreement, page 24, Section 2.04).

28.    Additionally, the Loan Agreement obligates ACR to deliver to the Trustee (i) certain quarterly interim financial statements; (ii) year end audited financial statements; (iii) a compliance certificate signed by a financial officer of ACR to accompany each financial statement, which certifies that (a) the financial statements fairly present ACR's financial condition in all "material respects" and is in accordance with Generally Accepted Accounting Principles and (b) that the financial officer has reviewed the Loan Documents and ACR is not in default (the "Compliance Certificate"); and (iv) notice of any default within five (5) business days after the occurrence of any event of default.  (Exhibit B, Loan Agreement, page 56, Section 7.06).

29.     DCO contracted with ACR for the construction, engineering, operation and maintenance of a central energy center and energy distribution system to serve the Revel. ("Revel CEC")[2]

30.     DCO and SJI, jointly and severally agreed to guaranty certain obligations of ACR under the ESA, which obligations were set out in two guaranty agreements, both dated April 11, 2011 (the "Guaranty Agreements").  True copies of the Guaranty Agreements are annexed hereto and incorporated herein as Exhibit H.

31.     Specifically, the Debt Service Reserve Joint and Several Guaranty Agreement ("Debt Service Guaranty") provides, among other things, a guarantee by DCO and SJI of the deposit of $2,778,000 into the Series B Bond Account.

32.     DCO and SJI likewise jointly and severally provide a guarantee in favor of Revel under the Amended and Restated Joint and Several Guaranty Agreement (the "Joint and Several Guaranty") for the payment by ACR to Revel of the Revel Advance, as defined in the ESA.


*ACR's Payment Obligations and Default under the Loan Documents*

33.     The Bonds are payable as to principal, premium, if any, and interest, from the payments to be made to the Authority by ACR under the Loan Agreement.

34.     Interest on the bonds is payable semi-annually on the first (1st) day of each June and December, commencing on June 1, 2011, until the final maturity date of the Bonds (i.e., in year 2032 for the Series A and year 2030 for the Series B).

35.     The Loan Agreement provides, inter alia, that a "default in the payment of any installment of the principal or interest on the Note within five (5) days of the date when due"

---

[2] SJI provided financing for the construction of the Revel CEC.

shall constitute an "Event of Default" under the Loan Agreement.  (Exhibit B, Loan Agreement, page 68, Section 8.01(b)).

36.     Paragraph 2.01 of the Loan Agreement specifies that on or before the 15th day of each month following August 2012, ACR is required to pay the Trustee ("Monthly Payments") as follows:

> " . . . one-sixth (1/6th) of the amount which is necessary for the payment of interest of the Bonds on the immediately succeeding June 1 and December 1, as the case may be, subject to credit for other available funds in the manner provided in the indenture."

(Exhibit B, Loan Agreement, page 22, Section 2.01(b)).

37.     In turn, the Monthly Payments by ACR to the Trustee support the biannual payments by the Trustee to the Bondholders.

38.     Upon information and belief, ACR defaulted under the Loan Agreement between April 2011 and July 15, 2014, by directing Revel to make payments due under the ESA into an account at Wells Fargo Bank, N.A., controlled by ACR, in violation of the Loan Agreement's mandate that all revenues be paid to the Trustee's Revenue Account to be applied for payments to the Bondholders. (Exhibit B, Loan Agreement, pages 22 and 69, Sections 2.01 and 8.01(a) and (n)). Further, upon information and belief, payments were improperly made from the same Wells Fargo Account.


*ACR Defaulted under the Loan Documents Because it Failed to Make Required Payments*

39.     ACR defaulted on the Loan Agreement because it failed to make a required contribution to the Series B Bond Account of the Debt Service Reserve Fund ("Series B Reserve Account") in the amount of $2,778,000, which was to have been paid by ACR to the Trustee "on the Existing Buyer Payments Repayment Date or prior to the expiration of the ten

(10) day cure period thereafter." (Exhibit B, Loan Agreement, page 67, Section 7.30). This date would have been no later than April 2, 2012.

40.     The Series B Reserve Account was held by the Trustee and provided crucial protection of the Bondholders' interests because it provided a source for payments to the Bondholders until the Revel Facility became consistently profitable.

41.     Thus, the Series B Reserve Account was a material part of the Bonds' security package because it represented a significant assurance of future payments to the Bondholders.

42.     In March 2014, the balance in the Series B Reserve Account held by the Trustee was approximately $2.8 million.

43.     In accordance with the terms of the Loan Documents, the Series B Reserve Account would have held at a minimum $5,556,000 in March 2014 (*i.e.*, the time Rosemawr purchased the Bonds), if it were fully funded.

44.     The Loan Documents provide that the debt service reserve fund accounts could only be reduced (i.e. withdrawals made by ACR) if the Revel (whose payment obligations under the ESA underpinned the ACR bond payments) had been open for at least nine (9) months and had reached certain operating metrics.

45.     Specifically, one of those metrics requires the Revel Interest Coverage Ratio, as defined in the ESA, to have been satisfied. (Exhibit B, Loan Agreement page 62, Section 7.17(b); Exhibit A, Energy Sales Agreement, page 28, Section 1.01).

46.     The Revel Interest Coverage Ratio refers to the Revel's adjusted consolidated EBITDA relative to Revel's adjusted interest expense. The required ratio is 1.2 to 1.0.  (Exhibit B, Loan Agreement, page 62, Section 7.17(b); Exhibit A, Energy Sales Agreement, page 58, Section 4.06(d)(i) and Sch. 28).

47.     Crucially, the Series B Reserve Account could only be depleted if the risk of default on payments to Bondholders had diminished because the Revel had met the metrics, which in turn, supported the assurance that payments to ACR would be made by Revel under the ESA.

48.     ACR failed to deliver to the Trustee notice of default within five (5) business days after the occurrence of each Event of Default, as required by the Loan Agreement and therefore, the Bondholders had no knowledge of any default.  (Exhibit B, Loan Agreement, page 56, Section 7.06).

49.     Therefore, in light of the fact that the Plaintiffs had no knowledge of Events of Default, the only reasonable explanation as to why the Series B Reserve Account held only approximately $2.8 million in March 2014 was because the Revel had met the required metrics and the Bonds were at a lowered risk of default.

50.     In reality, the Revel had not met those metrics and ACR had fraudulently committed multiple Events of Default.

51.     Further, the reason why there was only approximately $2.8 million in the Series B Reserve Account in March 2014 was because ACR failed to fully fund the Series B Reserve Account, even though there was a clear obligation under the Loan Agreement to fully fund the account.

52.     The failure to make such required payment to the Trustee constitutes an Event of Default under the Loan Agreement. (Exhibit B, Loan Agreement, page 69, Section 8.01(o)).

53.     Likewise, DCO and SJI are in default as they have not paid their Guaranteed Obligation to fund this amount under the Debt Service Guaranty.

*ACR Defaulted because Revel, in turn, had Defaulted under the ESA and Surreptitiously Entered into a Special Arrangement with ACR*

54.     Upon information and belief, Revel was not making its required monthly payments to ACR under the ESA (considered a Project Document under the Loan Agreement) but ACR chose to conceal this material breach by Revel from the Bondholders and the public because, under the Loan Documents, an Event of Default would occur with respect to the Bonds upon . . .  "a material breach of a Project Document (beyond any applicable grace, cure period set forth therein)" which gives ACR the right to terminate the ESA or suspend performance and which has not been cured within 30 days.  Therefore, a default by Revel to ACR constitutes a default by ACR to the Bondholders. (Exhibit A, Energy Sales Agreement, page 98, Section 12.01; Exhibit B, Loan Agreement, page 69, Section 8.01(m)).

55.     Likewise, an Event of Default under the Loan Agreement constitutes an Event of Default under the Indenture. (Exhibit G, Indenture, page 42, Section 9.01(c)).

56.     Further, ACR defaulted under the Loan Agreement, the ESA and the Indenture, by entering into a special payment arrangement ("Special Arrangement") with Revel pursuant to which ACR extended the Revel's payment terms under the ESA for the amount that was due on a February 2014 invoice. (Exhibit I, Letter regarding Special Arrangement).

57.     ACR entered into the Special Arrangement without proper authority because ACR did not obtain permission from or notify the Trustee or the Bondholders. (Exhibit I, Special Arrangement Letter; Exhibit B, Loan Agreement, page 67, Section 7.29; Exhibit G, Indenture, page 48, Section 10.05).

*ACR Defaulted because it Made Improper Dividend Payments to its Parent Company*

58.   ACR also defaulted under the Loan Agreement by improperly making restricted

payments in the form of dividends to its parent entity, Energenic (the "Dividend Payments").  Based

on a review of ACR's publicly available financial statements and the certificates attached to

their publicly filed financial statements, ACR made Dividend Payments to Energenic totaling

$8,520,000 in 2013 and $2.5 million in 2014. (Exhibit J, 2013 and 2014 ACR Financial

Statements).

59.   Under the Loan Agreement, upon an Event of Default, Dividend Payments were

prohibited as "Restricted Payments." (Exhibit B, Loan Agreement, page 67, Section 7.29).

Paragraph 7.29 of the Loan Agreement provides:

> "The Borrower shall not, directly or indirectly, declare, order, pay, make or set
> apart any sum for any Restricted Payment . . . . unless (a) at the time such Restricted
> Payment is made, no Default or Event of Default shall have occurred and be continuing or
> would result after giving effect to such Restricted Payment ."

60.   In this case, the Dividend Payments were improperly paid by ACR to Energenic

because they were paid after Events of Default since the Dividend Payments were made after failing

to make the contribution to the Series B Reserve Account. (Exhibit B, Loan Agreement, page 69,

Section 8.01(o))

61.   Additionally, upon information and belief, ACR also made the 2014 Dividend

Payments after entering into the Special Arrangement, which constitutes an Event of Default under

the Loan Agreement. (Exhibit B, Loan Agreement, pages 67-69, Sections 7.30 and 8.01(a)(b)

and (n)).

62.   Further, upon information and belief, certain of the Dividend Payments were

improperly paid from accounts other than the Trustee's revenue fund established under the

Indenture, in violation of Section 5.03(ii) of the Indenture. (Exhibit G, Indenture, page 24, Section 5.03(ii))

63.     An additional Event of Default occurred when ACR failed to provide Compliance Certificates to the Trustee in respect of the Dividend Payments paid in 2013 and $1.3 million of the Dividend Payments paid in 2014. (Exhibit B, Loan Agreement, page 67, Section 7.29).

64.     Likewise, upon information and belief, certain Compliance Certificates that were provided to the Trustee claimed that ACR had no knowledge of Events of Default, when in fact, they are likely untrue. Providing inaccurate Compliance Certificates would give rise to additional Events of Default under the Loan Agreement. (Exhibit B, Loan Agreement, page 68, Section 8.01 (a)).

65.     Likewise, the Dividend Payment made in the third Fiscal Quarter of 2013 was not paid on June 1 or December 1, the Interest Payment Dates (as defined in the Loan Agreement) in violation of Section 7.29 of the Loan Agreement. (Exhibit B, Loan Agreement, page 67, Section 7.29).

66.     The Loan Agreement required that all revenues from the ACR Facility be paid to the Trustee to be applied under the Indenture, primarily to make payments to the Bondholders. (Exhibit B, Loan Agreement, page 22, Section 2.01). ACR improperly and fraudulently made the Dividend Payments to Energenic without notifying the Trustee or the Bondholders and by failing to issue Compliance Certificates to the Trustee or pay on the identified Interest Payment Dates, all as described above as Events of Default, in violation of Section 7.29 of the Loan Agreement. (Exhibit B, Loan Agreement, page 22, 68-69, Sections 2.01, 8.01 (a) and (n)).

*Energenic Defaulted because it Improperly Retained Dividend Payments it received from ACR*

67.     Pursuant to the Pledge Agreement, Energenic, the owner of 100% of the membership interests in ACR, granted the Authority a first priority lien on and security interest in its interest in ACR, including:

   a.   (i) one hundred (100%) percent of the membership interests in ACR (the "Pledged Interests"),

   b.   (ii) any and all of the rights, powers, privileges, remedies and interest of [Energenic] in, to and under any of the Organizational Documents of Borrower,

   c.   (iii) all books and records pertaining to the Pledged Interests and the Organizational Documents of Borrower,

   d.   (iv) all of the collateral described in Paragraphs 3 and 4 [of the Pledge Agreement (namely, all distributions paid in respect of the Pledged Interests)], regardless of whether or not the same constitute proceeds of the Pledged Interests under applicable law, and

   e.   (v) to the extent not otherwise included, all proceeds and products of any and all of the foregoing.

(collectively, "Pledged Interests") (Exhibit K, Pledge Agreement, page 2, Section 2(a)).

68.     The Pledge Agreement secures, and the Pledged Interests serve as collateral security for, "the payment of all principal, interest and other amounts" due under the Loan Agreement.  (Exhibit K, Pledge Agreement, at page 1, Recital E).

69.     The Pledge Agreement further provides that Energenic "shall be liable for the deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Obligations and all expenses, including, without limitation, attorneys' fees and costs, which may be incurred by the" Trustee in collecting ACR's Obligations under the Loan Documents. (Exhibit K, Pledge Agreement, page 4, Section 7(a)).

70.     The Pledge Agreement also provides that, "[i]f while any Obligations [of ACR under the Loan Documents] are outstanding, the Pledgor [i.e. Energenic] . . . shall receive any . .

. distributions or other sums of money. . . in respect of the Pledged Interest . . . the Pledgor shall accept the same as an agent of" and hold same in trust for the Trustee as additional Collateral. (Exhibit K, Pledge Agreement, pages 2-3, Section 3).

71.     Therefore, Energenic was obligated (and remains obligated) to hold any dividend distributions it received from ACR in trust as additional Collateral.

72.     Upon information and belief, Energenic has failed to hold the Dividend Payments, which it received from ACR, in trust as additional Collateral and has wrongfully retained such funds for its own use.

*The Defendants Operated as a Single Scheming Entity*

73.     Energenic, through its members DCO and Marina, as well as SJI, created and used ACR as a corporate shell in an effort to shield itself from accountability and responsibility for their fraudulent activities.

74.     As the sole and controlling member of ACR, Energenic, through its members DCO and Marina, as well as Marina's parent company SJI, acted as a single economic enterprise with ACR.

75.     At all relevant times, Energenic, as the sole member of ACR and through DCO, Marina, and SJI, directed, controlled and dominated ACR and had complete autonomy and control over ACR and exerted such domination over ACR's polices, finances and business practices, that ACR did not have an identity and independence of its own.

76.     Corporate formalities were not observed, proper authorizations were not given, as required by the Loan Documents, and assets may have been comingled.

77.     For example, in both the Limited Liability Company Operating Agreement of

Energenic ("LLC Operating Agreement") and also in the Support Services Agreement between Energenic and Marina, dated as of 2009 ("Support Services Agreement"), Marina provides a Mays Landing, New Jersey address for its location that is the same address as that of DCO and Energenic ("Mays Landing Address").  Upon information and belief, a true copy of the LLC Operating Agreement is annexed hereto and incorporated herein as Exhibit L. Likewise, the notice provision of the Support Services Agreement provides that all communications and notices for Marina be sent to the same Mays Landing Address. Marina uses the Mays Landing Address, despite that its New Jersey corporate documents indicate a different address, one that, upon information and belief, is the same address as its parent SJI. A true copy of the Support Services Agreement is annexed hereto and incorporated herein as Exhibit M.

78.    Additionally, in a letter dated March 27, 2014 on ACR letterhead, the authorization for ACR's Special Arrangement was actually provided on behalf of ACR by Ms. Patricia Ehrhart who signed it on behalf of Energenic, not ACR. (Exhibit I, Special Arrangement Letter).

79.    Upon information and belief, Ms. Ehrhart is not even an officer of ACR.

80.    Additionally, upon information and belief, ACR's assets may have been comingled with a subsidiary of one of its ultimate parent entities, SJI.  Upon information and belief, in a separate Revel bankruptcy proceeding, Revel payments due to be made to ACR were apparently directed to Mr. Dave Robbins at the address of South Jersey Energy, a subsidiary of SJI, where Mr. Robbins is Senior Vice President. Upon information and belief, a true copy of the accounts payable statement evidencing the payment to Mr. Robbins is annexed hereto and incorporated herein as Exhibit N.

16

*Plaintiffs' Purchase of ACR's Bonds*

81.     On March 27, 2014, after reviewing the Official Statement, the prospectus

furnished in connection with the Bond Offering and the exhibits thereto, which include the

Indenture and the Loan Agreement, and such other documents as necessary to Plaintiffs'

decision whether to purchase the Bonds (the "Bond Documents"), including the Compliance

Certificates evidencing no Events of Default, as well as other information that would be

available in the public domain to a sophisticated investor, and, upon performing its own

investigation and analysis, Rosemawr purchased some of the Bonds, with the belief that it

was purchasing "non-defaulted" municipal bonds. A true copy of the Official Statement is

annexed hereto and incorporated herein as Exhibit O.

82.     Specifically, Plaintiff RMPF purchased Series 2011 Bonds at 92 ¼ (per $100

of face amount) in the face amount of $26,535,000 and Plaintiff RC1 purchased Series 2011

Bonds at 92 ¼ in the face amount of $8,465,000, for the combined total aggregate face amount of

$35 million.

83.     The price of 92 ¼ is consistent with a price for a performing security that has not

experienced events of default under its governing documents.

84.     The fact that the Bonds were in a non-default status was dispositive to Plaintiffs,

as Plaintiffs' would have never contemplated paying the price of 92.25 for a defaulted security.

85.     However, unbeknownst to Plaintiffs and to the public at the time that Plaintiffs

purchased the Bonds, ACR had knowingly and fraudulently defaulted on the Loan Agreement by

concealing Revel's default on its January 2014 monthly payment to ACR under the ESA. (Exhibit

A, Energy Sales Agreement, page 98, Section 12.01).

86.     Under the Loan Documents, Revel's default on its obligations under the ESA

flowed down to ACR and also constituted an Event of Default by ACR.

87.    ACR compounded its duplicity because it authorized the Special Arrangement for Revel, notwithstanding the fact that the Loan Documents required ACR to obtain the prior approval of the Bondholders for such authorization.

88.    ACR also failed to adequately fund the Series B Reserve Account and made improper Dividend Payments, which also converted the Bonds into a defaulted status.

89.    Notwithstanding ACR's multiple defaults, ACR concealed those defaults, which resulted in the Bonds' trading on the secondary market at prices representative of non-defaulting bonds.

*Plaintiffs' Reasonable Reliance on Defendants' Failure to Disclose Events of Default*

90.    The Plaintiffs reviewed the Bond Documents, performed their own analysis, and understood and evaluated the risks of their investment in the Bonds.

91.    Although it was public knowledge that the Revel Facility was not performing as well as Revel had intended, there was no reason to believe that Revel was defaulting on its payments to ACR, or entering into an improper Special Arrangement, or that ACR was failing to provide Compliance Certificates for the Dividend Payments or failing to fund the Series B Reserve Account, or paying improper Dividend Payments, or failing to deposit payments into the Revenue Account for the benefit of the Bondholders, because all of this information was purposely and fraudulently concealed by Defendants, including in their required Compliance Certificates.

92.    In fact, Plaintiffs had every reason to believe that the financing for the ACR Facility would not be jeopardized because the Revel Facility would require power, regardless of who purchased the building or the long-term intended use of the building. The Bonds were currently

performing, were supported by the contractually required reserves, and were in non-default status.

93.    The Loan Documents contained provisions intended to preserve the value of the Bonds, including the requirement to maintain contractually required levels of reserve funds.

94.    Unfortunately, Plaintiffs could not have known that Defendants were willfully and fraudulently concealing and intentionally misrepresenting material facts.

95.    If Plaintiffs had known about any of the Events of Default concealed by Defendants, Plaintiffs would not have purchased the ACR bonds at that price (i.e. 92 ¼).

*Defendants' malicious actions caused significant harm to Plaintiffs*

96.    Defendants fraudulently misrepresented – indeed, flatly lied about – material matters and purposefully concealed information that they knew was material to Plaintiffs and the other Bondholders in order to enrich themselves.

97.    Specifically, Defendants falsely m i s represented that the Bonds were performing and were in non-default status, omitted material facts regarding multiple other Events of Default under the Loan Agreement, and induced Plaintiffs and other Bondholders to purchase the Bonds as non-default bonds.

98.    As a direct result of the fraudulent concealment of material information, Plaintiffs purchased the Bonds at artificially inflated prices.

99.    The Bonds subsequently lost over seventy percent (70%) of their value.

100.    Had the Plaintiffs known the information that was fraudulently concealed by the Defendants prior to their purchase of the Bonds, the Plaintiffs would either have not purchased the Bonds altogether, avoiding any losses, or would have purchased the Bonds only at a dramatically lower price, thereby significantly reducing their losses.

*The Dividend Payments were a Fraudulent Transfer to Energenic*

101.    Upon information and belief, at the time of the Dividend Payments or shortly thereafter, ACR had insufficient funds to timely pay its obligations under the Loan Agreement and the payment of $11 million in Dividend Payments represented substantially all of ACR's liquid assets.

102.    As of June 15, 2014 and thereafter, ACR failed to make its Monthly Payments required to service its debt and became insolvent.

103.    Accordingly, as a result of Defendants' misrepresentation and material breaches of the Loan Documents and Bond Documents, Plaintiffs are entitled to damages, together with interest, costs and attorneys' fees.

## **FIRST COUNT**

### **Securities Fraud (17 C.F.R. 240.10b-5)**

104.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 103 of the Complaint as if set forth at length herein.

105.    The Bonds fall under the definition of a security pursuant to Section 2 of the Securities Act of 1933.

106.    Plaintiffs purchased the Bonds and ACR reaped the benefits thereof, as Borrower of the proceeds of the Bonds.

107.    As a part of and in furtherance of their scheme to defraud, Defendants (i) intentionally misrepresented and concealed material facts regarding the amount held in the Series B Reserve Account and the fact that Revel had defaulted on payments to ACR; (ii) entered into the Special Arrangement without proper authority; (iii) failed to provide Compliance Certificates or provided false Compliance Certificates that did not disclose the

Events of Default; (iv) improperly made payments to and from a Wells Fargo account, rather than the Trustee's Revenue Account, in violation of the Loan Agreement, and (v) fraudulently made the Dividend Payments.

108.     Defendants made the misrepresentations with the intent to carry out wrongful and fraudulent conduct.

109.     Plaintiffs relied on the misrepresentations made by Defendants in the Official Statement, and the exhibits thereto, in making its decision to purchase the Bonds.

110.     Plaintiffs would not have purchased the Bonds at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

111.     Defendants' breach of the Loan Agreement has proximately resulted in injury to Plaintiffs including, but not limited to, loss of or diminution of the value of the Bonds.

112.     By engaging in the foregoing conduct, Defendant violated Section 10(b) of the Exchange Act (15 U.S.C. 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).


**WHEREFORE**, Plaintiffs request that this Court enter judgment as follows:

a.     Awarding Plaintiffs damages, including interest;

b.     Awarding Plaintiffs compensatory and consequential damages, attorney's fees, interest, and costs associated with bringing this suit; and

c.     Awarding such other equitable/injunctive relief as this Court may deem just and proper.

## SECOND COUNT

### Fraudulent Transfer (N.J.S.A. § 25:2-25)

113.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 112 of the Complaint as if set forth at length herein.

114.     ACR fraudulently and improperly transferred $11.02 million in Dividend Payments to Energenic, with the intent to hinder, delay, or defraud creditors.

115.     ACR made this transfer with knowledge that it had committed an Event of Default under the Loan Agreement.

116.     As a wholly-owned subsidiary of Energenic, ACR was entirely controlled by Energenic, and Energenic qualifies as an insider under the applicable law. *See* N.J.S.A. § 25:2–22(b).

117.     ACR transferred the Dividend Payments to Energenic with the intent to defraud Plaintiffs and the other Bondholders.

118.     ACR concealed the transfers and did not notify the Trustee and Bondholders.

119.     At the time of the transfer, ACR had insufficient funds to timely pay its obligations under the Loan Agreement. The payment of $11.02 million in Dividend Payments represented substantially all of ACR's assets and, shortly after the transfer, ACR became insolvent.

120.     Energenic's acceptance of the Dividend Payments was not in good faith, as it was aware that ACR had committed Events of Default and did not hold the payments in trust, as required by the Pledge Agreement.

121.     The illegal transfer of the $11.02 million of Dividend Payments to Energenic was possible, because ACR was, in fact, the alter ego of Energenic.

122.    As a result, ACR's corporate entity should be disregarded and Energenic, DCO, Marina, and SJI should all be jointly and severally liable for the acts and omissions of ACR.

**WHEREFORE**, Plaintiffs request that this Court enter judgment as follows:

a.    Imposing an equitable lien upon the assets of Defendants in the amount of $11.02 million resulting from the fraudulent transfer of the Dividend Payments to Energenic, plus any additional amounts resulting from any transfers or payments made improperly by Defendants;

b.    Imposing a resulting trust on all of the assets of Defendants in the amount of $11.02 million plus any other amounts shown to have been transferred or paid improperly by Defendants;

c.    Temporarily, preliminarily, and permanently prohibiting Defendants from selling, leasing, transferring, marketing, or offering to sell, lease, or transfer the ACR Facility to anyone but Plaintiffs;

d.    Awarding Plaintiffs damages, including interest;

e.    Awarding Plaintiffs compensatory and consequential damages, attorney's fees, interest, and costs associated with bringing this suit; and

f.    Awarding such other equitable/injunctive relief as this Court may deem just and proper.

## <u>DESIGNATION OF TRIAL COUNSEL</u>

Plaintiffs designate A. Jeff Ifrah as trial counsel in this matter.


Dated: September 16, 2015                    /s/ A. Jeff Ifrah

                                                A. Jeff Ifrah (N.J. Bar No. 050691992)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006
Tel. (202) 524-4140
Fax (202) 524-4141
jeff@ifrahlaw.com
*Attorney for Plaintiffs*